CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

DEC 1 6 2011

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **JEFFREY E. WHITEBEY,** | ) | **CASE NO. 7:11CV00105** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **R. A. SARRGE, ET AL.,** | ) | **By: Glen E. Conrad** |
| | ) | **Chief United States District Judge** |
| **Defendants.** | ) | |

Jeffrey E. Whitebey, a Virginia inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging that the defendant police officers[1] violated his constitutional rights when they stopped him for a traffic violation, pursued and arrested him, and booked him for various charges.[2] He also alleges that they used excessive force while arresting him. He seeks monetary damages. After careful review of the parties' submissions, the court concludes that defendants' motion for summary judgment must be granted on the ground of qualified immunity.

## I. Background

### A. Plaintiff's allegations

On March 12, 2009, Whitebey was driving a friend's car in a residential area. As he came up to a stop sign, he saw a silver-gray four-door car sitting across the street from the stop sign. That car then pulled beside Whitebey's vehicle and "placed his police lights on." Defendant Sarrge came to the driver's window and asked Whitebey, "Do you know how fast you

---

[1] Whitebey names as defendants R. A. Sarrge, a police sergeant for the Roanoke City Police Department, and C. Aaron Helton, who was a Roanoke City police officer at the time of the alleged violations. Helton is now employed as a United States Marshal in Washington, D.C.

[2] Ultimately, Whitebey pleaded guilty to a misdemeanor charge of evading police, in exchange for dismissal of other charges.

were going?"  Whitebey said that he was going the speed limit.  Sarrge then asked for

Whitebey's driver's license and registration.  Whitebey produced his national identification card

and supporting documentation, but could not find the registration, since it was not his car.  The

officer asked again for a driver's license, and Whitebey explained that he did not have a license,

but that the paperwork he had produced should prove that he had been granted a right to travel on

the roadway.  Sarrge went to his car and then returned to Whitebey's window, stating:  "DMV

does not have you registered.[3]  Wait a minute."  Sarrge went to his vehicle a second time for

about four minutes.  Shortly thereafter, a black-and-white car marked "K-9" pulled up behind

Whitebey's car.  Defendant Helton (Helton) told Whitebey to step out of the car.  Instead,

Whitebey drove away, and the officers got in their cars and chased him.

      The chase ended at an apartment complex less than a mile from the scene of the traffic

stop.  Whitebey got out of his car and "ran, where about (8) cars away dropped his phone and

turned around and [saw Helton] running to catch up with [him].  [Whitebey] stated, 'I give up.'

[Helton] stated, with gun drawn, pointing at [Whitebey], lay face down on the ground."

      Whitebey "laid on the ground," and Helton put his knee in Whitebey's lower back and

said, "[P]ut your arms behind you."  After he put a handcuff on Whitebey's right wrist, Helton

said, "[G]ive me your left arm."

      Whitebey said, "I'm a major heart patient and have a scar on my chest and just had a

neck brace removed[, so] be careful with me, I'm trying to get my arm out from under me, I

can't get my arm out because your knee is in my back."

---

[3]  Whitebey asserts that months before the traffic stop, he had given the DMV in Roanoke his national identification records, which they copied, and a police lieutenant had told him to carry his records with him, which he did.

Helton said, "[S]hut up," and hit Whitebey over the right eye with his pepper spray can, saying, "[G]ive me your arm."  Helton then sprayed pepper spray three times in Whitebey's mouth and eyes.

Whitebey  "start[ed] kicking, spitting, and sa[id], '[I] can't breathe, why do that I told you I was a major heart patient.'"

Helton pulled Whitebey onto his side, grabbed his left arm, and handcuffed him.   An ambulance arrived, and its attendants treated Whitebey's eyes.  The police officers then transported Whitebey to the sheriff's office/jail, where a nurse treated his eyes again.  He was unable to see for half an hour after being sprayed.  At the jail, Whitebey complained that he was a heart patient and felt lightheaded and asked to be taken to a hospital, but he was not taken at that time.  A magistrate issued tickets and denied bond.  When sheriff's staff wanted to take his fingerprints, Whiebey said, "I need to go to the hospital, the fingerprints can wait, my health is more important, I'm not going nowhere!"  A deputy told Whitebey, "[Y]ou can see the nurse after you give up your fingerprints."  Whitebey said, "[T]hose are my birthrights, are unalienable, I'm not giving up them."

The deputy placed Whitebey in a holding cell, saying, "[U]ntil you give up your fingerprints you can [sic] see the nurse!"  Six hours later, the deputy asked Whitebey, "Are you ready to give up your fingerprints?"  After Whitebey complied with this procedure, a nurse examined him, found that his blood pressure was extremely high, and told deputies that he should go to a hospital right away.  An hour later (seven hours after the arrest), deputies took pictures of Whitebey's injuries and transported him to the hospital.

Emergency room staff took and tested Whitebey's blood and "found the pepper spray in it."  Whitebey was admitted to the hospital and remained there for two and a half days for more

tests.  Doctors did surgery to check the status of a stent that had been placed in Whitebey's heart two weeks earlier.  Hospital staff allegedly told Whitebey that he had suffered a mild heart attack "d[ue] to what had happen[ed when the] officer pepper sprayed me."

After this incident, state authorities brought the following criminal charges against Whitebey:  (1) speeding; (2) driving without a license; (3) possession with intent to distribute marijuana; and (4) eluding police.  Whitebey pleaded guilty to a misdemeanor charge of eluding police, and pursuant to a plea agreement, the other charges were nolle prossed.  For the one conviction, the General District Court for Roanoke City sentenced Whitebey to serve six months imprisonment, with five months suspended.

## B. Defendants' Evidence

In support of their motion for summary judgment, defendants offer a somewhat different version of events, as detailed in the officers' affidavits.[4]  On March 12, 2009, Sgt. R. A. Sarrge was stationed in his patrol car in a Roanoke parking lot when he saw a silver Chrysler traveling at a high rate of speed along a section of Courtland Road where the speed limit is 25 miles per hour.  Estimating that the Chrysler was going about 45 miles per hour, Sarrge activated his RADAR unit, which calculated the Chrysler's speed at 37 miles per hour as the vehicle was slowing down to stop at a stop sign.[5]  Sarrge decided to pull the Chrysler over to address the issue of speeding in a residential area, pulled his own car alongside the other car as it was stopped at the stop sign, and walked up to the driver's window.

---

[4]   Defendants Sarrge and Helton, along with Lt. Clingenpeel of the Roanoke City Police and Barry Kincer, a Firefighter and Emergency Medical Technician who treated Whitebey on March 12, 2009, filed affidavits in support of the motion for summary judgment.

[5]   Sarrge tested his radar unit at the end of his shift on March 12, 2009, and found it properly functioning.

Sarrge asked the driver if he knew why he was being stopped, and the driver replied that he was not speeding and volunteered that he had a "right to travel card." Standing at the car window, Sarrge detected an odor consistent with unburned marijuana coming from the interior of the Chrysler. The driver identified himself to Sarrge as Jeffrey Whitebey. Sarrge returned to his patrol car to run the information through DMV and NCIC data bases to see if Whitebey was wanted. While Sarrge was in his vehicle, Lt. Clingenpeel informed him over the radio that Whitebey had prior dealings with drugs and had been involved in a homicide investigation. Sarrge called a backup unit to his location and returned to Whitebey's window to gain more information. Shortly, Sarrge went back to the patrol car to verify Whitebey's identity and to see if any warrants were outstanding against him.

Meanwhile, the police dispatcher notified Helton that Sarrge needed backup. At the same time Sarrge approached Whitebey's car window for the third time, Helton pulled his vehicle up behind Whitebey's car. As he did so, Whitebey sped away in the Chrysler, spinning his tires and heading east on Oakland Boulevard. Helton, in his patrol car, pursued Whitebey, and Sarrge got in his car and followed. During the pursuit, which continued for several blocks. Helton saw Whitebey throw a plastic baggie containing a substance that appeared to be marijuana out the window. Sarrge stopped to retrieve the baggie, while Helton continued pursuing Whitebey. During the pursuit, Clingenpeel cautioned Helton over the radio that Whitebey was under investigation related to a series of home invasions in Franklin County and was believed to be armed.[6]

---

[6] Clingenpeel cautioned both Sarrge and Helton that Whitebey might be armed and should be considered dangerous, based on Clingenpeel's personal awareness that Whitebey had been implicated in home invasions in which he was suspected of using a firearm and that Whitebey had been involved in suspected drug activity and was a "person of interest" in a homicide investigation.

After making a couple of turns, Whitebey swung his car into the parking lot of the Afton Garden Apartments.  Helton pulled his car into the lot behind Whitebey and saw him get out of his car and flee on foot.  As Helton followed on foot, he saw Whitebey running with his left hand inside his jacket pocket.[7]  As he approached the corner of an apartment building, Whitebey "stopped, turned suddenly towards [Helton] in an aggressive stance and confronted [him] face to face."[8]  Helton saw Whitebey pulling a bright shiny silver object out of his jacket pocket and believed that Whitebey was pulling a gun from his pocket to shoot him.  From a distance of five feet, Helton lunged toward Whitebey "to disarm him" and struck him on the side of his head.  Helton's momentum caused him to tackle Whitebey to the sidewalk.  The impact dislodged the silver object from Whitebey's hand and in the fall, the left side of Whitebey's head hit the sidewalk.  Helton states, "Only after the arrest was completed, was I able to see that the silver object that I believed was a gun was actually a chrome colored cell phone."

Once Helton had Whitebey on the ground, he commanded that Whitebey bring his hands out from under his body, still believing that Whitebey was armed.  Whitebey did not comply.  In an attempt to convince him to bring his hands out, Helton struck Whitebey with his fists several times on his upper torso.  Whitebey still did not reveal his hands.  Helton then sprayed Whitebey with pepper spray and was able to gain control of Whitebey's hands and handcuff them behind his back.

---

[7]  Whitebey contends that at this point in the chase, when he was about 60 feet in front of Helton, Whitebey dropped his cell phone.  (ECF No. 26, p. 16.)  He also denies that the cell phone could be mistaken for a gun.

[8]  Whitebey states that he could not physically have turned his head to look back at Helton.  He states that he had two broken bones in his neck and had worn a neck brace until March 11, 2009, the day before this incident.  (ECF No. 26, p. 16.)

Sarrge, who arrived on the scene of the arrest after Helton had taken Whitebey to the ground, saw Whitebey resisting and failing to comply with Helton's orders to bring his hands out from under his body.  Sarrge tried to "utilize pain compliant pressure points" on Whitebey's head area to convince him to comply with Helton's commands, but Sarrge's hands found blood on Whitebey's head and slipped off.  Sarrge did not see Helton striking Whitebey.

Both officers stated that Whitebey first complained of chest pain "as the arrest was completed," and told officers that he had undergone heart surgery.  Officers immediately called a rescue unit to the scene.  Rescue squad personnel checked Whitebey for injuries, provided him with decontamination from the pepper spray, and cleaned the blood from his face.  They treated a small cut on Whitebey's right eyelid and flushed his eyes with sterile water.   Whitebey told EMT Kincer that he felt pressure in his chest.  Kincer checked Whitebey's vital signs, found them to be within normal ranges, and cleared him for transport to the booking area.  In the docketing area, jail medics checked Whitebey's vital signs again and cleared him for booking.

Another officer investigating the case found a second baggy of marijuana near the location where Sarrge had recovered the first baggy.  Testing of the substance in both bags indicated that they contained a total of 8.1 grams of marijuana.  Officials also recovered two cellular telephones and $658 in cash from Whitebey.  Officers discovered that Whitebey had been released on bond on charges of home invasion in Franklin County.

### C.  Plaintiff's Claims

In his initial complaint, Whitebey asserted general claims of unreasonable seizure and excessive force.  In August 2011, after defendants filed their motion for summary judgment,

Whitebey filed a pleading that the defendants and the court construed as a motion to amend.[9]

Defendants have objected to Whitebey's August 2011 amendment as untimely filed, because

Whitebey filed it more than 21 days after his original complaint was served on them.

Rule 15(a)(1) allows amendment of a pleading without consent from the opponent or the

court within 21 days after the pleading is served or 21 days after a responsive pleading is served.

All other pretrial amendments require the opponent's consent or leave of court, which shall be

freely granted "when justice so requires." FED. R. CIV. P. 15(a)(2).  Whitebey states that his

August 2011 submission was an amendment to his response to the summary judgment motion

and that the amendment was filed within 21 days from when he served the response.  Moreover,

he asserts that the August 2011 amendment is actually just a clarification of the claims and

demands for relief that he intended to raise in the initial complaint, to which the defendants have

already responded.  The court agrees and finds that justice requires granting the amendment. [10]

Liberally construing Whitebey's rather rambling submissions, the court finds that he has

asserted the following claims against Helton and Sarrge:  (1) Sarrge deprived Whitebey of his

constitutional right to confront the evidence against him in that no evidence was presented to any

court to support Sarrge's charge that Whitebey was exceeding the posted speed limit on March

---

[9] Whitebey styled his original response to defendants' dispositive motion as "PLAINTIFF'S
CROSS COUNTER COMPLAINT TO DEFENDANT'S MOTION AND MEMORANDUM IN
SUPPORT FOR SUMMARY JUDGMENT."  He styles his August 2011 submission (ECF No. 29) as
"AMENDED SUPPLEMENT TO PLAINTIFF['S] CROSS COUNTER COMPLAINT."  After a lengthy,
rambling collection of definitions and citations of state statutes and constitutional provisions related to
corporations, contracts, copyright law, racial categories, slavery, and personal property law, Whitebey
lists seven "counts" against Sarrge and Helton and states demands for relief.

[10] Several weeks after filing his initial response to the defendants' motion for summary judgment,
Whitebey filed yet another amendment to his response (ECF No. 37).  Although this amendment is not
timely under Rule 15(a), the court will consider the arguments raised as supplementary to his previously
filed pleadings.   The court does not construe, and will not consider, this pleading to raise additional,
separate claims for relief, however.

12, 2009;[11] (2) Sarrge violated Whitebey's "right to travel" by charging him with the criminal offense of driving without a license, despite the fact that Whitebey informed Sarrge that he had appropriate documentation allowing him to drive on Virginia roadways; (3) the traffic stop was constitutionally unreasonable, because the length of the stop "may [have] been over more than 15 minutes" without probable cause; (4) by placing Whitebey's name and other identifying information on the charging instruments issued after his arrest, Sarrge unlawfully took and converted Whitebey's personal property (his name and identity) without just compensation; (5) Sarrge unlawfully deprived Whitebey of his personal identity by listing his race as "black," instead of "Human-Asiatic," on the charging instruments; (6) Sarrge and Helton, by using excessive force against Whitebey, deprived him of his "right to natural life" without his consent; and (7) the defendants' actions deprived Whitebey of his "Personal Liberty Rights."[12]

## II. Discussion

### A. Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For a party's evidence to raise a genuine issue of material fact sufficient to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In making this

---

[11]   Whitebey also asserts in this "count" that Sarrge "subjected [him] to Virginia law . . . without his consent." (ECF No. 29, p. 24.) To the extent that Whitebey intends this statement as a separate claim for relief, it is nonsensical and must be summarily dismissed, pursuant to § 1915A(b)(1). Whitebey subjected himself to Virginia law by driving a motor vehicle on Virginia roadways.

[12]   Whitebey alleges in some detail the medical care he sought after the arrest and appears to complain about some delays. He does not, however, state any clear claim, or facts to support such a claim, alleging that Sarrge or Helton personally undertook any action to delay his access to adequate medical care after the arrest.

determination, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Com. v. Catrett, 477 U.S. 317, 323 (1986). Then, the burden shifts to the nonmoving party to show that such an issue does, in fact, exist. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Com., 475 U.S. 574, 586-87 (1986). To forestall summary judgment, the nonmoving party must set forth more than a "mere . . . scintilla of evidence." Anderson, 477 U.S. at 252. At the very least, the nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (citing Barwick v. Celotex Com., 736 F.2d 946, 963 (4th Cir. 1984)).

The court finds defendants' motion for summary judgment to be ripe for adjudication. Plaintiff served discovery requests, and defendants responded to those requests at the same time they filed their motion. The court notified plaintiff of defendants' motion on June 28, 2011, and warned him that judgment might be entered for defendants if he did not respond with evidence contradicting their evidence and arguments. Whitebey filed a timely response to the motion.[13] He has not submitted affidavits in support of his response. However, in this circuit, a verified complaint by a pro se prisoner "may be considered in opposition to summary judgment" when the allegations it contains are based on "his own personal knowledge and set forth facts

---

[13]   Whitebey recently filed a request for production of documents in Case No. 7:10CV00150, his previous civil action, which was dismissed without prejudice. Although Whitebey cited the old case number on his discovery motion, it is clear from the documents he requests that he intended the motion to be addressed in this pending case. Therefore, the court will direct the clerk to redocket the discovery request here. The new discovery requests do not affect the ripeness of the summary judgment motion, because Whitebey offers no indication that responses to these discovery requests are necessary for completion of his opposition to defendants' motion. See FED. R. CIV. P. 56(d).

admissible in evidence."   <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991); <u>Davis v. Zahradnick</u>, 600 F.2d 458, 460 (4th Cir. 1979).

## B.  Claims of Unreasonable Seizure

Whitebey filed suit under 42 U.S.C. § 1983, which imposes civil liability for constitutional violations committed under color of state law.  It is undisputed that while conducting the traffic stop and arrest at issue, the defendant police officers acted under color of state law and are thus subject to suit under § 1983 for those actions in their individual capacities.[14]

Several of Whitebey's claims allege that Defendant Sarrge violated his right to be free from unreasonable seizures.  In moving for summary judgment, the defendants argue that these claims fail on the merits.[15]

### 1.  Applicable Law Regarding Unreasonable Seizures

The Fourth Amendment to the United States Constitution provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

---

[14]   <u>See West v. Atkins</u>, 487 U.S. 42, 50 (1988) ("generally, a public employee acts under color of state law while . . . exercising his responsibilities pursuant to state law"); <u>see also</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 26 (1991) (recognizing that state official sued in individual capacity is subject to suit under § 1983 for damages caused by their personal conduct in violation of a plaintiff's constitutional rights).

[15]   In the alternative, defendants argue that Sarrge is entitled to qualified immunity against Whitebey's claims for monetary damages.  Because the court finds that Sarrge is entitled to summary judgment on the merits of the claims that the traffic stop and the subsequent pursuit were unreasonable seizures, the court need not decide separately the qualified immunity issue as to these claims.  <u>See</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800. 818 (1982) (finding that qualified immunity protects government officials performing discretionary functions from liability for civil damages where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").

U.S. Const., amend. IV.  The amendment applies to all seizures of the person, from traditional arrests to an officer's brief verbal or physical restraint of a person's freedom to walk down the street.  United States v. Brignoni–Ponce, 422 U.S. 873, 878 (1975).  "The reasonableness of any seizure depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."  Id.

To make a lawful arrest of an individual in his home, where his expectation of privacy is high, an officer must, with few exceptions, obtain a warrant after a showing of probable cause to believe that individual committed the crime charged.  Payton v. New York, 445 U.S. 573 (1980). On the public street, however, an officer may lawfully effect an arrest without a warrant, provided that he has probable cause.  United States Santana, 427 U.S. 38 (1976).  Probable cause to arrest exists if, given the totality of the circumstances, the officer "had reasonably trustworthy information . . . sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."  Beck v. Ohio, 379 U.S. 89, 91 (1964).

Even without probable cause as defined in Beck, if a police officer's "observations lead him reasonably to suspect" that a person walking or riding in a vehicle on the public street has committed, is committing, or is about to commit a crime, the officer may detain that person briefly in order to "investigate the circumstances that provoke suspicion."  Brignoni–Ponce, 422 U.S. at 881 (applying Terry v. Ohio, 392 U.S. 1 (1968)).  Reasonable suspicion to support such a Terry stop is more than a hunch, but less than probable cause and "considerably less than proof of wrongdoing by a preponderance of evidence."  Alabama v. White, 496 U.S. 325, 329-30 (1990) (citation omitted).  In addition, both the duration of a Terry stop and the nature of investigation it involves must be reasonably related in scope to the suspicions that justified the initial detention.  Brignoni–Ponce, 422 U.S. at 881.

A traffic stop falls into the <u>Terry</u> stop category and is lawful if the officer had reasonable suspicion, or probable cause, to believe that a traffic violation had occurred and he diligently undertook to complete the necessary incidents to such a stop, using the "least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." <u>United States v. Digiovanni</u>, 650 F.3d 498, 506-507 (4th Cir. 2011).  In diligently completing a valid traffic stop, the officer may request the driver's "license and vehicle registration, run[ ] a computer check, and issu[e] a ticket." <u>Id.</u> at 507.  To lawfully extend the duration of "a traffic stop to allow for investigation into a matter outside the scope of the initial stop, [an officer] must possess reasonable suspicion" of additional criminal activity.  <u>Id.</u>  If the officer simply makes inquiries not directly related to the normal facets of a traffic stop, however, such questions alone "do not convert the encounter into something other than a lawful seizure," provided they "do not measurably extend the duration of the stop" necessary to effectuate its purposes.  <u>Arizona v. Johnson</u>, 555 U.S. 323, 333-34 (2009).

The  Fourth Circuit found the 15-minute stop at issue in <u>Digiovanni</u> to be unreasonable, because the officer spent the first 10 minutes conducting an unjustified drug-trafficking investigation instead of immediately beginning the records checks normally performed in a traffic stop context.  650 F.3d at 509-12.  The Court, however, reemphasized its long-established rule that "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision."  <u>Id.</u> at 511.  A longer period of detention after a traffic stop may be justified by such factors as out-of-state driver's identification, computer searches that take longer than usual, or a minimal wait for a K-9 unit to process the scene.  <u>Id.</u>  The odor of marijuana emanating from the open window of a vehicle during a traffic stop gives an officer probable cause to search that vehicle for drugs and thus justifies a longer detention of the suspect.  <u>United</u>

States v. Lewis, 606 F.3d 193, 198 (4th Cir. 2010).  Similarly, if a suspect's response to an illegal stop "is itself a new, distinct crime, then the police constitutionally may arrest the [suspect] for that crime."  Sprinkle, 106 F.3d at 619 (omitting internal quotations).

### 2. The Initial Traffic Stop

The defendants' evidence establishes that Sarrge had probable cause to pull Whitebey over for a suspected traffic violation.  Sarrge, an experienced police officer, visually observed Whitebey's speed in a residential area at exceeding the posted 25 miles per hour speed limit, estimated his speed to be 45 miles per hour when first observed, and measured his speed by radar at 37 miles per hour.  Sarrge's estimation of Whitebey's speed and his radar measurement constituted "reasonably trustworthy information . . . sufficient to warrant a prudent man in believing" Whitebey had violated the posted speed limit and thus satisfied the probable cause requirement as defined in Beck, 379 U.S. at 91 so as to justify the initial traffic stop.

Whitebey complains that Sarrge did not have a reliable vantage point to estimate his speed, seeks documentation of the radar measurement, and asserts that he was denied the right to confront the evidence of speeding.  By pleading guilty pursuant to an agreement whereby the speeding charge was dismissed, however, Whitebey waived his right to confront Sarrge in court over the accusation of speeding and his right to obtain and present evidence toward proving his innocence of speeding beyond a reasonable doubt.  Tollett v. Henderson, 411 U.S. 258 (1973); Brady v. United States, 397 U.S. 742, 750 (1970).

For the stated reasons, the court finds no material fact in dispute as to whether the initial traffic stop was reasonable under the Fourth Amendment and concludes that the defendants are entitled to summary judgment as to Whitebey's Claim (1).

14

### 3. The Duration of the Traffic Stop

In Claim (3), Whitebey asserts that Sarrge had no probable cause for detaining him as long as he did, because Sarrge produced no evidence that Whitebey was speeding, had no reason to check DMV records since Whitebey had another form of driver authorization, and had no viable evidence that Whitebey had commited a drug offense, as proven by the fact that the drug charge was later nolle prossed.   Reviewing the evidence as a whole, however, the court finds no genuine issue of material fact here as to whether the traffic stop on March 12, 2009 was reasonable in either scope or duration.

First, as stated, Sarrge's experienced estimation of Whitebey's speed and his radar reading of the suspect's speed gave him probable cause to believe that Whitebey had violated the area speed limit and justified the initial stop.  Concurrently, his reasonable belief that Whitebey had been speeding also gave Sarrge justification to conduct the proper investigative accoutrements to the traffic stop, such as requesting Whitebey's license, running the identification card produced through available data bases, and checking the calibration of his radar equipment.

Second, nothing in the record indicates that Sarrge failed to act with diligence in performing these permissible traffic stop duties or performed unjustified background checks. Whitebey's own allegations indicate that Sarrge came directly to his window and asked for license and registration, then returned to his car to run computer checks.  Although Whitebey complains that Sarrge spent more time than necessary on these investigations, he admits that he could not produce either of the requested documents, an omission that justified a more detailed background check of the identification he did provide.  Even now, Whitebey offers the court no documentation verifying that the travel card he produced to Sarrge provided him full, legal

authority to drive a car on Virginia roadways.[16]  The mere fact that the charge for driving without

a license was dismissed pursuant to the plea agreement does not prove that Whitebey's travel

card was so clearly valid that Sarrge had no justification for investigating Whitebey's identity.[17]

Third, Whitebey fails to demonstrate that the stop lasted longer than necessary for the

purposes for which Sarrge had sufficient legal justification.  Indeed, neither party has provided

the court with the time of the initial traffic stop, and Whitebey has roughly estimated its duration

at around fifteen minutes from the time Sarrge pulled up beside him until Whitebey chose to

leave the scene.  The court finds no indication from the record that fifteen minutes was longer

than necessary for Sarrge to complete appropriate records checks, given Whitebey's unusual

form of ID and failure to produce registration.  Once Sarrge's checking turned up evidence of

Whitebey's past involvement in criminal activity and investigations, the officer obtained yet

another basis for reasonable suspicion to support more detailed records checking.  Sprinkle, 106

F.3d at 617.

Moreover, once Sarrge detected the odor of marijuana wafting from Whitebey's car

window, he immediately obtained not only reasonable suspicion to investigate Whitebey for

possible involvement in a drug-related offense, in addition to the suspected traffic violation, but

also obtained probable cause to search the vehicle for marijuana.  Lewis, 606 F.3d at 198.  The

reliability of Sarrge's sense of smell was soon confirmed when officers saw Whitebey toss a

baggy of the drug out the window and later verified its contents.  Thus, to the extent that Sarrge's

---

[16]  Whitebey appears to believe that documents he requested from the defendants in discovery are
part of the record, but neither party has submitted these documents to the court.

[17]  In Claim (2), Whitebey asserts that Sarrge somehow violated his "right to travel" by charging
him for driving without a license, despite his production of the travel card.  Even if Whitebey could prove
that production of the travel card was a complete defense to this charge, he fails to demonstrate any
constitutional deprivation here, as the traffic stop itself was justified for other reasons and the charge for
driving without a license was dismissed.

16

call for a K-9 unit and the wait for that unit's arrival prolonged the stop past the time required for investigation of the traffic violation itself, this additional detention time was supported by separate probable cause and was not unreasonable under the Fourth Amendment.

For the stated reasons, the court finds no genuine issue of material fact in dispute as to the reasonableness of the traffic stop and concludes that defendants are entitled to summary judgment as a matter of law as to Claims (1), (2), and (3).

### 4. Probable Cause for Arrest

Whitebey does not clearly raise any separate claims concerning the reasonableness of the officer's pursuit of his vehicle after he left the scene of the traffic stop or their pursuit of him when he fled the car on foot. Defendants assert that these actions were reasonable, because by the time the chase began, they had obtained probable cause to arrest Whitebey for one or more criminal offenses. The court agrees.

Sarrge's command for Whitebey to exit his vehicle after the K-9 unit arrived was a lawful tangent to the valid traffic stop. See Pennsylvania v. Mimms, 434 U.S. 106, 111 n. 6 (1977) ("once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures"). Under Virginia law,

> [a]ny person who, having received a visible or audible signal from any law-enforcement officer to bring his motor vehicle to a stop, drives such motor vehicle in a willful and wanton disregard of such signal or who attempts to escape or elude such law-enforcement officer whether on foot, in the vehicle, or by any other means, is guilty of a Class 2 misdemeanor.

Virginia Code § 46.2-817. Thus, when Sarrge ordered Whitebey out of his car, and Whitebey chose instead to step on the gas and leave the scene, the officers reasonably believed that his actions met the elements of the offense defined in § 46.2-817, eluding police, and immediately

had probable cause to pursue and arrest him on that charge. Beck, 379 U.S. at 91. After they observed Whitebey throw a baggy of marijuana out the car window during the chase, they could also reasonably have believed that he had committed a drug-related offense, thus constituting another instance of probable cause supporting his arrest. Id. Whitebey's flight on foot supported Helton's continued belief, based on his own observations, that Whitebey had committed, or was continuing to commit, the offense of eluding police, thereby giving the officer probable cause to stop Whitebey and arrest him on that charge, in addition to a suspected drug charge. Finally, Whitebey's subsequent conviction on the charge of eluding police proves as a matter of law that police had probable cause for the arrest. Cramer v. Crutchfield, 648 F.2d 943, 946 (4th Cir. 1981). Thus, to the extent that Whitebey raises any claim regarding the officers' probable cause to chase and arrest him, defendants are entitled to summary judgment.

### C. Claims Alleging Excessive Force on Arrest

Whitebey alleges in Claim (6) that Sarrge and Helton used excessive force in arresting him on March 12, 2009 and that they each failed to protect him from the other's use of excessive force. Defendants argue that the "undisputed facts" confirm that Helton and Sarrge used only reasonable force to apprehend and arrest Whitebey and, in the alternative, that the officers are entitled to qualified immunity against Whitebey's claims for damages for excessive force. Determining whether public officers are entitled to qualified immunity involves two steps of analysis. First, the court must consider whether, "[t]aken in the light most favorable to the party asserting the injury, ... the facts alleged show [that] the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated" even when the facts are viewed in the best light for the injured plaintiff, the plaintiff cannot prevail. Id. Where the alleged facts have shown a constitutional violation, the defendant

officer will still be shielded from all liability under the doctrine of qualified immunity if the constitutional right alleged to have been violated was not "clearly established" at the time of the incident. Id. Therefore, to survive the motion for summary judgment, Whitebey must have stated a violation of a constitutional right that was clearly established on March 12, 2009, when he suffered his injuries.

"It is clearly established that citizens have a Fourth Amendment right to be free from unreasonable seizures accomplished by excessive force." Valladares v. Cordero, 552 F.3d 384, 388 (4th Cir. 2009). In assessing claims of excessive force under the Fourth Amendment, the court must apply a standard of "objective reasonableness." Graham v. Connor, 490 U.S. 386, 395 (1989). Specifically, the court must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (citing Graham, 490 U .S. at 396-397). This standard mandates "a careful balancing" of Fourth Amendment rights "against the countervailing governmental interests at stake." Id. at 396 "Recognizing that 'police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving'-[the court must] consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the '20/20 vision of hindsight.' " Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002) (quoting Graham, 490 U.S. at 396, 397). Thus, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" violates the Fourth Amendment. Graham, 490 U.S. at 396.

Determining whether a "reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force" requires a fact-specific analysis of the particular circumstances of the case at hand. Id. at 396-97. The Graham decision

offers three factors to consider when determining whether a given use of force was excessive: (1) the "severity of the crime at issue," (2) whether the suspect poses an "immediate threat to the safety of the officers or others," and (3) whether the suspect is "actively resisting arrest or attempting to evade arrest by flight." Id. at 396. The Fourth Circuit has also indicated that a consideration of the extent of the plaintiff's injury may be relevant in determining whether an officer's particular use of force was reasonable. See Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003). But see Wilson v. Flynn, 429 F.3d 465, 468 (4th Cir. 2005) (mentioning only the Graham factors).

As an initial matter, Whitebey clearly states in the complaint that Sarrge "was not around" during the time when Helton was applying the handcuffs to Whitebey. (ECF No. 1 at 8.) Moreover, Whitebey does not allege any physical act that Sarrge committed against him, or describe any forceful act that either officer committed against him after he was handcuffed. Finally, if Sarrge was not in the vicinity while Helton was using force against Whitebey, Sarrge cannot be liable as a bystander for failing to prevent Helton's use of force. See Randall v. Prince George's County, Md., 302 F.3d 188, 204 (4th Cir. 2002) (finding that law enforcement officer may incur bystander liability under § 1983 if he (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act). Similarly, Helton cannot be liable for failing to prevent Sarrge from using excessive force against Whitebey, where Whitebey fails to allege that Sarrge applied any force against him. Accordingly, as to the allegations in Claim (6) that defendants used excessive force, Sarrge is entitled to summary judgment, and as to allegations of bystander liability, both defendants are entitled to summary judgment on Claim (6).

Whitebey admits that he drove away from the scene of the traffic stop after Sarrge commanded him to exit his car and that after he stopped the car, he ran from Helton on foot. Based on this history, the officers had probable cause to pursue and arrest him for eluding police. He alleges, however, that as Helton ran up behind him, he stopped and told the officer that he was giving up, he complied with Helton's command to "lay face down on the ground," he advised Helton that he was a "major heart patient" and that he was trying to get his arm out as directed, but could not do so because of the defendant's knee in his back.  He further asserts that, despite his statements about his heart problems and his inability to pull his hands out from underneath his body, Helton struck him above the eye with the pepper spray canister and then sprayed pepper spray in his face.  Whitebey alleges that the pepper spray made him start kicking and spitting, because he could not breathe, and that in the end, Helton rolled him to one side in order to get hold of his left hand and apply the handcuffs.

Construing Whitebey's allegations in the light most favorable to him, he alleges Helton employed excessive force in the following respects:  (a) Helton's pointing a gun at Whitebey and ordering him to lie face down; (b) Helton's putting a knee in Whitebey's back so that Whitebey could not comply with the order to put both hands behind him; (c) Helton's striking Whitebey with the pepper spray can; and (d) Helton's spraying Whitebey with pepper spray.  Whitebey's flight from the traffic stop scene, in his car and then on foot, gave the officers clear probable cause to arrest him for eluding police.  They also suspected him of a drug trafficking offense, based on his disposal of the baggie during the chase and were advised by their supervisor that Whitebey might be armed and dangerous.  Thus, the first Graham factor weighs against Whitebey as to all these uses of force.  Because it is possible that one of the instances may have been justified under the second and third Graham factors, while the other one was not, the court

will separately analyze the allegations.  See <u>Waterman v. Batton</u>, 393 F.3d 471, 481 (4th Cir.

2005).

### a. Order at Gun Point to Lie Down

Whitebey's own allegations demonstrate that Helton's order at gun point for Whitebey to

lie down was not excessive force under the circumstances.  Whitebey's behavior indicated to the

officers a good chance that he would not cooperate in the arrest without application of some

force and that it was difficult to predict how he would react to their orders.  Thus, the third

<u>Graham</u> factor weighs against Whitebey.   The second <u>Graham</u> factor is equally unhelpful to

him.   A reasonable officer under the circumstances Helton faced, as a lone officer, without

backup, chasing a fleeing suspect into an apartment complex where he might have a weapon or

cohorts to turn against the officer, could have believed that the suspect, even after he stopped

voluntarily, posed a threat to his safety sufficient to warrant the officer's pulling and displaying

his firearm during the arrest.[18]

### b. Knee in the Back, Blows to the Head, and Pepper Spray

When a fleeing suspect voluntarily stops and lies down in obedience to an officer's order,

arguably, he does not pose the same degree of risk or the same level of resistance as he did when

running or standing.  The <u>Graham</u> factors, however, require the court to view the situation from

the perspective of a reasonable officer under the same circumstances.  In this case, the court

cannot ignore the undisputed evidence that circumstances supported Helton's reasonable fear

that Whitebey might be armed and dangerous.  Helton had received reliable information from his

supervisor about Whitebey's criminal history and current criminal charges for home invasions in

which a firearm may have been used.  He had also seen Whitebey flee from police, had seen

---

[18]   In his affidavit, Helton does not state that he pulled his gun or ordered Whitebey to the ground; rather, he states that he thought a cell phone in Whitebey's hand was a gun and tackled Whitebey to the ground.

Whitebey place his hand in his pocket, and had perceived a metal object in Whitebey's hand that he believed might be a gun.[19]  With this information coloring his perspective, Helton reasonably could have believed that Whitebey's attempted surrender was actually a confrontation or pretended cooperation to gain advantage.

Moreover, Whitebey does not explain why he, as a heart patient who had recently removed his neck brace, ran from police in the first place or explain why he concealed his left hand under his body when he placed himself on the ground.  Facing these conflicting circumstances, Helton could reasonably have believed that Whitebey's positioning, his heart condition statement, and his claims that he could not remove his left hand from under his body were additional indications of a pretense of cooperation and of continued resistance to police orders.  Certainly, Whitebey's actions and comments, taken together with Helton's other information about the suspect, left open the very real possibility that Whitebey might have a weapon in the hand concealed under his body.

Faced with restraining such a suspect by himself, without back up, in an area chosen by the suspect, Helton could reasonably have believed that additional physical force of some limited type was justified to get Whitebey safely under control.  When verbal orders did not achieve the desired result, Helton allegedly struck Whitebey in the face with a pepper spray can, shortly followed with bursts of the pepper spray itself.   Once the suspect was sufficiently distracted by the effects of the pepper spray, Helton reasonably could have believed it safe to roll him over enough to grab his free hand and place it in the handcuff.

The nature of Whitebey's stated injuries does not weigh against Helton in the balance of factors the court must consider in analyzing the excessive force claim.   Jones, 325 F.3d at 527.

---

[19]   Whitebey claims he had dropped his cell phone before he stopped to face Helton, but Helton reasonably could have overlooked the falling object, or could have believed Whitebey had other such objects, including a gun, hidden in his clothing or hands.

Whitebey submits photographs of himself after the incident, displaying a deep cut on his right

eye lid and cheek, the eye blackened, and a long scratch on his lower back.  He alleges that these

physical injuries occurred during Helton's efforts to make him produce his left hand for

handcuffing, and indeed, they are the type of injuries to be expected from the types of force

allegedly applied during this process.  Moreover, Whitebey does not allege that Helton applied

any additional force after applying the handcuff to his left wrist.

Whitebey claims that material disputes preclude summary judgment, such as whether his

phone could reasonably have been mistaken for a gun; whether he dropped his phone while

running; and as to the period in time when he advised Helton of his heart condition and his

inability to produce his left hand as ordered.  Because the court must view these circumstances

from the officer's perspective, however, the court finds no material dispute of fact.  Because the

undisputed evidence indicates that Helton reasonably could have believed that the types of force

applied were reasonable under the circumstances, Whitebey has failed to demonstrate that the

officer's actions violated his Fourth Amendment right to be free from excessive police force.

Jones, 325 F.3d at 530-31.

The court also concludes that even if Whitebey's allegations could be interpreted to state

a Fourth Amendment claim, nevertheless Helton is entitled to summary judgment on the ground

of qualified immunity.  A government official is entitled to qualified immunity if his conduct

"does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, qualified

immunity shields an officer from liability when he reasonably, even if mistakenly, believes that

his conduct complies with the law.  Pearson v. Callahan, 555 U.S. 223, 244-45 (2009).  The

court's inquiry must be "whether 'the state of the law' at the time of the events at issue gave the

officer fair warning that his alleged treatment of the plaintiff was unconstitutional." Jones, 325 F.3d at 531 (quoting Hope v. Pelzer, 536 U.S. 730, 740 (2002)).

Helton argues that he is entitled to qualified immunity, because it was clearly established under Fourth Circuit law at the time of Whitebey's arrest that it is reasonable for a police officer to use a closed fist strike and mace to subdue a suspect who resists arrest by refusing to present his hands to be cuffed.  He cites several cases, particularly relying on Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005).[20]  In Wilson, police had several pieces of information supporting a reasonable belief that Wilson had committed a crime and posed an immediate danger to others; the suspect's wife had sought police intervention, reporting that Wilson was drunk and tearing up the house, that there was a gun in the house, and she feared for the safety of herself and her young children; and police saw Wilson "disable the car his wife had been driving and tell her that she would not be going anywhere with their small child."  Id. at 468.  Police also reasonably believed from Wilson's behavior that he was resisting arrest:  when ordered to present his hands to be handcuffed, he walked away toward his house, told the officer "not to grab his hands," and then actively scuffled with the officer who was trying to restrain him.  Id.

Whitebey asserts that his case is distinguishable from the Wilson case:  the crimes of which he was suspected were relatively minor; he had not threatened harm to anyone, verbally or physically; he did not confront Helton after the chase; the cell phone he carried could not

---

[20]  The other cases Helton cites also support a finding that established Fourth Circuit precedent recognized that an officer, reasonably believing that a suspect was armed and confrontational, could properly use sufficient force to gain control of the situation.  See Anderson v. Russell, 247 F.3d 125 (4th Cir. 2001) (affirming trial court's grant of judgment as a matter of law on the ground of qualified immunity to the officer defendant who shot an unarmed suspect whom the officer believed was reaching for a gun); McLenagan v. Karnes, 27 F.3d 1002, 1005 n. 5 (4th Cir. 1994) (granting summary judgment on the ground of qualified immunity, based on the officer defendant's undisputed and reasonable belief that the suspect was armed); Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996) (granting summary judgment on the ground of qualified immunity where undisputed evidence indicated that "immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them from only a few feet away with his finger on the trigger").

reasonably have been mistaken for a gun; he dropped the cell phone early in the chase; and he voluntarily placed himself on the ground and presented one hand to the officer.  He also alleges that he attempted to present the other hand, but was prevented from doing so by Helton's own actions, and that Helton ignored his verbal explanations for the noncompliance.

These allegations, however, do not take into account how Whitebey's actions could reasonably have been interpreted by an officer under the totality of the circumstances.  Whitebey does not dispute the contention that Helton had evidence of Whitebey's past criminal behavior, including possible use of a firearm.  Even assuming that Whitebey attempted to surrender and did not intend anyone any harm, Helton reasonably could have interpreted Whitebey's actions as a confrontation and his comments as part of a ruse to gain the opportunity to produce a firearm from under his body to fire at the officer.  The court concludes that the officer's reasonable perception that Whitebey's actions presented a substantial risk, to the officer and potentially to others in the apartment complex, places his case within the <u>Wilson</u> category, in which some force is justified to accomplish restraint of a potentially dangerous suspect.  Whitebey's own allegations indicate that he was not successfully handcuffed until after the alleged uses of force, and the record does not indicate any use of force after Helton accomplished the cuffing process. <u>See Wilson</u>, 429 F.3d at 467-69 (finding that cessation of violence after cuffing supporting qualified immunity defense).  Thus, the court concludes that under established law at the time of Whitebey's arrest on March 12, 2009, an officer reasonably could have believed that the use of force in the manner Whitebey alleged did not violate his Fourth Amendment right.  The court concludes that Helton is entitled to summary judgment on the ground of qualified immunity as to the excessive force allegations in Claim (6).

### D.  Other Claims

The defendants have not moved for summary judgment as to any of Whitebey's Claims (4), (5), and (7).  As stated, Whitebey did not clearly set forth these issues as claims in his complaint, but clarified them in his August 2011 amendment, and the court liberally construes this clarification as relating back to issues discussed in the complaint.  Claims (4) and (5) concern Whitebey's apparent belief that he has a property interest in his name and racial identity under Virginia law, which Sarrge somehow infringed by listing Whitebey's name and race on the charging instruments issued after the March 12, 2009 incident at issue here.  Such state law claims are not independently actionable under § 1983, which was intended to protect only federal rights and not claims for which there are adequate remedies under state law.  Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985).  Because the court has determined that Sarrge is entitled to summary judgment as to all federal claims against him, the court declines to exercise supplemental jurisdiction over Claims (4) and (5) alleging state law violations and will summarily dismiss them without prejudice accordingly.  See 28 U.S.C. § 1367(c).

As stated, Whitebey's pro se pleadings are difficult to understand.  Liberally construing Claim (7), Whitebey lists several "personal liberty rights"– constitutional rights, contract rights, privacy rights, the right to go about his business without disclosing it to neighbors, his right not to be forced to incriminate himself, his right to be free "from arrest or seizure except under proper law," his right to freedom of movement without threat of imprisonment, and his right to use roadways and waterways.  Then, he contends that the defendants violated his personal property rights under various constitutional provisions and federal statutes.[21]  Finally, he

---

[21]   Whitebey also reasserts the state law property claims against Sarrge, which the court has already addressed as Claims (4) and (5).

contends that Helton and Sarrge violated their professional obligations as police officers by taking away his federal and state rights without his "written signature."

The court must hold pleadings filed by a pro se litigant to a less stringent standard than that applied to formal pleadings drafted by lawyers and should ensure that meritorious claims are not lost because the litigant did not properly present it.  See Haines v. Kerner, 404 U.S. 519, 520 (1972); Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978).  On the other hand, this requirement to liberally construe pro se pleadings does not mean that judges are "required to construct a [pro se] party's legal arguments for him."  Small v. Endicott, 998 F.2d 411, 417-18 (7th Cir. 1993).

The court has reviewed Whitebey's submissions carefully, including his initial complaint, his response to the motion to dismiss, and his amended responses (ECF Nos. 29 and 37).  While the court does not doubt Whitebey's sincerity in presenting his legal arguments under corporate and property law, due process, and various federal statutes, at the same time, the court cannot decipher from his discussions any viable legal claims arising from his factual allegations.  Accordingly, with the exception of the Fourth Amendment claims already discussed, the court finds it appropriate to summarily dismiss without prejudice, pursuant to 28 U.S.C. § 1915A(b)(1), Claim (7) and any related claims fairly raised by Whitebey's additional submissions.

### III

In conclusion, the court will grant defendants' motion for summary judgment as to plaintiff's Fourth Amendment claims and will summarily dismiss all other claims for the reasons stated, pursuant to 28 U.S.C. §§ 1367(c) and 1915A(b)(1).  An appropriate order will issue this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants.

ENTER:  This _15th_ day of December, 2011.

_Glen Conrad_

Chief United States District Judge